Case number 22-1221, et al. Aberdeen, Kansas Central, Inc, et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Sheppard for the petitioners. Ms. Taylor for the intervener for the petitioners. Mr. Estes for the respondents. Mr. Binet for the interveners for the respondents. Good morning. Before we begin, I just wanted to acknowledge our dear colleague, Judge Davidson Tell, who this will be his last hearing with us. Sitting with us, I am in honor to work with him and very honored to actually occupy the seat that he vacated to make way for me, a seat that was occupied previously by Justice Scalia, Judge Sentell. So, we thank you for your service and wish you well. Thank you, sir. Thank you, Judge. Thank you, Mr. Sheppard. You may proceed. Good morning, and may it please the Court. I'm Sheppard for the petitioners, the Aberdeen companies, and Grid Alliance. We've requested two minutes for rebuttal. Judge Wilkins, Judge Walker, and especially today, Judge Sentell, PERC's orders below impose a new voting scheme for zonal reliability criteria in the Southwest Power Pool that can only result in a systematic denial of cost-sharing for zonally and regionally beneficial transmission projects. That violates the cost causation principle and therefore the Federal Power Act because, as this Court has repeatedly held, PERC may not single out a party for the full cost of a project or even most of it if the benefits of the project refuse. For that reason, PERC may also not prohibit cost-sharing for any projects included in a regional plan only to satisfy an individual utility's planning criteria, which is directly the opposite of PERC's order below. To be just and reasonable, rates must reflect, to some degree, the cost actually incurred by the customer who must pay for them, and that degree cannot be zero. Apart from this unlawful result, the orders below also severely violate decision-making requirements under both the FPA and the APA, for example, among other things, by unlawfully shifting the burden of proof to protesters below and by disregarding relevant precedent. To the extent that the Court reaches the final issue in this case, which is the directed briefing on the subject of procedural requirements regarding petitions for review, the petitioners continue to maintain that it is entirely the sufficient and the most efficient way to solve the procedural issues that arise whenever PERC issues a modification order after a petition for review has already begun, simply to amend the petition, not to require that an entirely new petition be filed with all the attendant burdens that are associated. Returning now to the real heart of the case. PERC and SPP say that the purpose of the voting changes that they imposed below was to promote transparency and consensus, and that this equitable input would, in PERC's view, abate the incentive transmission owners have as rational economic entities to develop upgrades that solely or disproportionately benefit their own customers. That's a laudable goal, but the risk of gold plating, which is the industry terminology for this kind of overbilled risk, has been present since the inception of Part 2 of the Federal PER Act in 1935, and there are lots of different remedies to deal with it, including, for example, post hoc prudence reviews that used to be a regular feature of this court's jurisprudence in the 80s and the 90s. This, however, is the first time that PERC has attempted to allow, here, that the proposed cure is worsening disease because this is the first time that PERC has allowed transmission customers, not even writ large, but very small groups of transmission customers, the ability to, and the incentive to, veto ex ante any cost for accessibility. Are there ever going to be instances where a project is done, let's say Evergy does a project, and it benefits only Evergy? I don't think that is possible, given the nature of the way that the zones are built. It used to be the case up until 1999, and this court so held all the way up through that point, that PERC would generally impute benefits to everyone in a particular zone because the whole system was interconnected. The first time you see that change is in the Seventh Circuit's decision in 2009, the first of the Illinois Commerce decisions, which then is repeated a couple years later on demand, and then this court turned the world back into a more of a synthetic response, instead of these two antipodes in ODAC, by saying no, whether it's what we want you to do for us is not create bright line rules one way or the other to actually do your job as an expert agency and figure out where the distribution benefits are supposed to be. But to your question about how, but what would what would happen here, it's part of the reason we put the maps to the extent you're able to read them into the situation, into the briefs, because I think it's very apparent just by looking at the zones. When you're looking at these islands of these very small entities who like Lesotho in South Africa are completely surrounded by other transmission projects, it's just not tenable that PERC is going to, that those projects are not going to benefit everyone in the zone. And that really gets to the heart of the of the of the duologue. What about a project that would benefit the company that makes the improvement? What about a project that benefits them 99.5, 99.5 percent of the benefits go to the company that did it? Well, how often do you think I think that that's normally the way that we would that we would address this is to is to is to go back to the status quo ante. So prior to the changes that happened here, this is one of the reasons why we kept talking about this as a a solution in search of a problem. To the extent that there was ever a risk that there was going to be, as PERC puts it, the they wanted to abate the incentive to to build projects that would disproportionately advantage their own customers. The there was a built-in cure because none of those smaller entities were ever going to be allocated per rata based on load. If they were only one percent below, it could still be allocated in a vastly disproportionate way. If 99.5 percent of the benefit is going to go to Evergy and Evergy is only going to have to pay 90 percent of the cost, then the you know that that's a what the math is 20 times the other companies paying 20 times more than they're getting a benefit. Well, I don't think anyone's ever suggested that that anyone's allocation would ever go higher than their load ratio. And if we were any more complicated system, very much unlike SPP, let's say in PJM where they have solutions based distribution factor analyses and other very precise ways of setting things advance. SPP does not do that kind of that kind of study in the same way, so we're not going to get those kind of precise. Let me let me get clarification with what you just said. You said you don't think anybody would say that there's an instance where a small player in the market is going to get less percentage benefit than they're paying the percentage of the cost. I think that that is a possibility if the system is entirely broken. What I was trying to say, Your Honor, is that no one, to my knowledge, has ever advocated a situation where anyone's cost responsibility would exceed their actual load within the zone. I suppose it is possible to conjure a situation. I'll concede the theoretical possibility that that could occur. Just as FERC conceded what they described as a theoretical possibility, we regard as an absolute categorical imperative that people are going to reject those, that the transition customers are going to reject any cost allocation to the extent that they can. You're saying it hasn't happened yet? No, it hasn't. Let me ask one more question if I may. Were there companies with a similar market position to Evergy and the 2022 Southwest plan? Oh, AOG, our supporting intervener, Ohio Gas and Electric. Who supported the plan? Who supported the plan? Well, it depends on how you're describing them in terms of the Yes, it's a complicated answer. There are, for example, transmission-owning utilities who are primarily based, like AEP is, in a different RTO, but they have joint projects here. So, writ large, they're kind of, they look a lot like Evergy, they look a lot like OGE, but here, and they're SPP guys, they are here as half-owners of merchant transmission facilities, for example. But if Your Honor's question is that, is there anyone who looks like a vertically integrated utility who was in favor of this proposal? Sure, there were some. Particularly, in the zones that were particularly hard to work out, like Zone 19 is this giant conglomeration of LDCs. Why would they have supported it so much, if it was going to allow other companies to free ride off? Well, because in those situations, and this is a situation where there could be a case for transparency or collaboration, but for something I'd like to discuss about the 28K letter we filed yesterday. But in those situations, you have much more evenly balanced things. It is much less irrational for it to look at a situation where there are three evenly balanced TOs in a zone, and it's okay, you guys, argue amongst yourselves, figure out how you want to do this, come to some sort of conclusion. That's not what's happening here. The asymmetry is that we've got customers who are going against other customers. One side's got a TO, a vertically integrated TO representing them. The other one has a municipal or a cooperative or some other form. But the problem here is you've got one pricing zone that we've got people on the opposite side of the same street, where they just happen to be inside the cooperative zone or they are outside of the line versus the energy side of the line. And in a situation where one side of the street can just say, ex ante, we don't want to pay for this because we're small. And even with our 1%, that's enough for us to cover half of the remaining distance once we account for the primary load serving entities load. There's no reason for them to negotiate with us. So I think that maybe I could help by saying our protest is a protest against the entire regime writ large because there is no exception for situations like ours or OGE's. So our three zones and the OGE zone, there's just a radical disproportionality that looks a lot more like the PSED case in PGM. That was a good order. The FERC was very intelligent to, in a situation where there was a massive proliferation of the number of transmission owners, to say, oh, when this brought their attention, we can't have a situation where because of their numeracy, suddenly we're this body of entities that controls 2% to 3% collectively of the entire grid to override everyone else. So setting a 95% threshold there made some sense. I see that I'm out of time or running close to my time. Is there, did I answer your question, Ron? Yes. Right. Are there any further questions? We'll hear you on rebuttal. Thank you. Good morning, your honors. May it please the court, I'm Carla Taylor on behalf of Intervenor Oklahoma Gas and Electric Company. Good morning. Good morning. FERC's order doesn't pass the basic requirement of reasoned decision-making because there's no articulable principle that governs the succession of orders that it's issued over planning processes. If you go back to the PSED order, where it ruled with respect to voting processes in PGM, it said, if there's large transmission owners who have an overwhelmingly greater investment in the transmission assets, what they're planning proposals shouldn't be thwarted by a coalition of minority owners that collectively have a far smaller investment in the grid. But in this case, FERC has turned around and said, well, in this case, we are going to allow not just minority we're not going to argue. If I understand the position of the petitioner correctly, they're saying or that your plan provides a situation in which if they're going to make improvements that they could be making, the smallholder can stand by and say, no, we don't approve it. Yet it will go ahead and be done anyway, but it needs to be. And then the smallholder will be getting a free ride departing from the cost causation principle. Are they wrong in that analysis? Or am I wrong in my understanding of that analysis? So that there are they wrong? I'm sorry, I didn't fully hear. But their analysis is that it will incentivize a departure from the cost causation principle because the smallholder will have an incentive to just vote vote no and still get the benefit because they will go forward with the project anyway, if that's the only negative. That's exactly right, your honor. So there's why isn't that a incentivizing a departure from the cost causation principle? So the way that this plan is structured, it actually, if you assume that everyone's going to behave in accordance with their, you know, rational economic behavior, the default is that the transmission owner who doesn't get their criteria approved is going to have to pay for the entire cost of the upgrade itself. So that's what happens if the criteria don't get through. So far, that's what that's what they're saying. And if they will go into it themselves, then that causes the smallholder to be in a position of a free rider with respect to that cost allocation. Right. The small owners have every incentive to be to be free riders. At the same time, at the first step, it's not even transmission owners who have a veto power. It's customers. Customers are the ones who pay the bill. Yeah, that's always so there's absolutely no rational incentive for a customer at step one of the voting process to vote in favor of criteria proposed by a large transmission owner. When if they vote no, they're going to get the exact same upgrade for free because the transmission owner has the regulatory obligation to make appropriate upgrades to the assets in order to maintain reliability. So baked into this entire voting scheme are incentives to shoot down transmission upgrades that will have that are going to have zonal benefits because the the customers and the small transmission owners know that they're going to get the same thing regardless of whether they vote yes or no. Burke says that you didn't identify any projects of the 26 or so projects that were discussed that had significant zonal benefits. What's your response? So our response is that they are that there's evidence in the record that there were at least between 2011 and 2020, 26 projects that SPP had identified based on local planning criteria that it directed to be built because they were going to have zonal benefits. So that is evidence in the record. Also, taking a step back, their argument amounts, the entire purpose of this voting enterprise is because SPP believes and we believe that there are going to be upgrade projects that have zonal benefits. That's the only reason to have a process for approving criteria for zonal planning. And now, Burke is saying, oh, but there's no evidence that any projects are ever going to have zonal benefits. Well, that's contradicted by the 26 recognized projects from the past. But it also is, you know, an irrational way to analyze this entire endeavor, which is to say, OK, so it's a gamble that they're going to they're going to want to make an improvement where they will want the approval by the large holder that they're going to be log rolling. Is that is that Burke's position? I'm not sure. So Burke's position, I believe, is that we're going, you know, it doesn't matter if the criteria achieve cost causation because there are going to be no projects identified through this zonal planning process that have zonal benefits. But that is, you know, that that's nonsensical to say. And I think that brings us in the standard, not just that they have some zonal benefits. Substantial or trying to remember the wording, so that I think in the cost causation cases, I believe that is the is that the LSP case that use the word substantial and they do rely on that. But if you look at starting with the old Dominion case and going through LSP, a consistent I, you know, theme in those cases is that for can't acknowledge that there's a category of projects that's going to have whether it's regional or zonal benefits, benefits beyond the transmission under doing the upgrade. And then I use a rule that is going to categorically exclude distributing the costs for those projects in the zone or region. And that's what this this is again, this entire voting process is premised on the idea that there are projects that are going to benefit the zone, but it's established a voting process with incentives. That means that it's going to categorically exclude cost sharing from those for paying for those zonal projects. Because again, if you assume that these companies, which are all, you know, economical actors are going to obey rational incentives, they're going to shoot down the criteria that would lead to upgrades being approved because they know they'll get the same benefit for free. Isn't there a fail safe in the event that, you know, all of the parade of horribles that you and your colleague predict actually happen that with respect to a specific project, then a request could be made that a different cost sharing is essentially an exception from the tariff can be can be used for that project. So our understanding is that we would have two possible avenues if, as we expect people behave rationally and start shooting down the appropriate criteria. One would be that we that says we can go to SPP and seek a different zonal mechanism as zone 19, which has a separate scheme. But in order to do that, we would have to get some consensus in our zone, go to SPP. There are various committees that would have to ultimately be approved by the SPP Board of Directors. So it's not a question of just saying, hey, we would like an exception. And then, of course, ultimately be approved by FERC. And then the other would be that down the road, we could maybe bring a 206 challenge and try to and try to get a different result. But I think that as petitioners identify, there would be a substantial concern that any subsequent challenge would be barred as a collateral attack on this order. This order is currently it's the idea is to ex ante, establish rational criteria, a rational process for identifying zonal criteria. And so here we're here to identify to assess whether FERC has given a reason basis for approving SPP's proposal. And so we think the moment is now to assess whether they have. And the answer is that they have not, because this contradicts not only the PSAG order that they gave, recognizing the value of the importance of letting large transmission owners not be thwarted by tiny minority stakeholders, but also order 890, where some commenters had actually asked that they give customers voting rights in the planning processes. And they said, no, customers don't need to have voting rights. Now they've designed an entire and it's enough if they have a voice. And now they've designed an entire project, an entire planning system around giving customers not just voting rights, but veto power. Any other questions? Thank you. You're from birth, Mr. You're not matched. The stature of my opponents at least in height. Good morning on that. As this here, the half of the Federal Energy Regulatory Commission, I'd like to start with some questions judge sentel asked about incentives. Uh, there are, in fact, as the commission found incentives for large and small customers to agree. To write planning criteria, that's because. Large and small customers like the power. And so. If the, if the small customer vetoes a project, the large customer wants. Large customer in turn can just veto or not build projects. Small customer. That seems to theorize that or bet that the small customers are going to have. And desire to make some improvement later, that would be a place where there would be a makeup. Miss call if they make a mistake here, it doesn't. I didn't see anything that established for me that there would necessarily be. A balance that would cause that to be the way the balance would swing in the decision making by the. Small customer. No, it's an incentive ahead of time to agree on. Projects that will benefit. Let me give you the example that the commission gave. In its order, which is the parties know that if they can't reach agreement on criteria. In the Southwest, we'll do planning based solely on. Criteria and regional. Criteria and so the odds are that projects that don't meet those. Criteria won't be built. Well, a small, a small owner or a customer might. Prefer that some additional projects be built. And the only way that it will have to happen is to reach an agreement. With the transmission owner on what this project should be. Likewise. Evergy can do what they threatened they would do in their petition for rehearing before the commission. Which is to build projects that only benefit their own customers. And not because not the other customers who again. Might want a project that would provide benefits to the whole. Evergy's attorney today's suggested that that's. Inconceivable that a project could only benefit Evergy. Well, that's not what Evergy told the commission in its order and it's also not. It's inconsistent with the entire premise of this proposal, which is not. That's what they say. That's what they say, but that's not they've also said they have the incentive. To build projects that won't benefit the entire zone. And the, the entire premise, you have a. I wouldn't expect you to, but do you have a site? I can find exactly what you're talking about there where they said 1 thing before and now they're saying something. Yes, if you look at their hearing or page 30, which is. They said that their incentive would be the project if they don't get joint. Allocation that they would, their incentive would be to build projects. That didn't benefit their customers, they said something similar. In their original protest at page 13 day, a 131. I get your answer to. 2 questions that have been asked of opposing counsel. 1 is. Do you know of companies in a similar market position to and grid lions who support it? Southwest to 2022 plan. And I'll just give you the 2nd question and then you can take them in whatever order you want. Would it be possible down the road or a company like grid lines to bring a 206 challenge? Or are they right? That it would be, it would be hard as a collateral attack on something that's already been litigated. Sure, with respect to your 1st question, that's not in the record. My understanding is. There are a number of companies that potentially are in the same position. I have to correct 1 thing that counsel for energy said. AP also owns a large integrated utility in the Southwest region. And as does Excel. So those are large companies. I believe there may be other companies. And I think that's an important point because. These companies. Don't agree that it's self evident that there could never be agreement. On these projects, and it's important to understand. From their perspective. They are in the exact same position as petitioners in this regard. But they are putting at risk their ability to gain allocation for. Don't allow allocation for their project. Their best possible cost allocation result under the new. Proposal is what they automatically would have had. Under the old proposal where they were automatically entitled. Allocate their costs to the entire zone. Now, I'm sorry, I don't remember your 2nd question. The possibility of a 206 challenge down the road. Yes, it is possible. The folks not going to come into court and say, this is barred because it's a collateral attack. Et cetera, et cetera, et cetera, what they just said a few minutes ago. No, because, I mean, it would depend on what they say, but I, I would think what they would say is. Your original order was based on your. Prediction that consensus could be reached. But now here are facts showing that, in fact. There isn't any consensus is not possible. I'd also point out that the commission said that. Zones could propose. Amended voting procedures and. I don't know that exactly the, I don't think the mechanism for doing that. It's been established yet, but that's another possibility. So, going back to my 1st question and your answer to it about the other companies, why would a company with a similar market share. Be supportive in a way that evergy and grid lines are not you said that they, they were supportive, but why if it's not going to put them in any better position than they were in before and run the risk of them being in a worse. I think it's because they disagree with the petitioners that this is. That there's no actual problem there. I think they're concerned that other transmission owners in their zone. Would be able to those projects that impose costs on their customers that they don't think are justified. So, if I'm following right and this makes total sense to me, let's take. Evergy's situation, let's imagine that they have 90% of the market share in a particular zone. If a small company doesn't does a project. That evergy thinks is only going to benefit the small company. Under the old system, evergy would be on the hook for 90% of the costs. Is that right? That's exactly right. Your honor. I think that's why. The vast majority of transmission owners and customers support this and that old system would violate the cost causation principle much more than the new system does. That's right. I think that was the choice the commission had. When I presented with Southwest proposal, they could reject the proposal and keep the system. Where it appears there is a problem where transmission owners could. Allocate to the entire zone projects. It didn't benefit the entire zone, or they could approve Southwest proposal. Which creates a mechanism where all entities in a zone. And reach agreement on what types of projects should be allocated zone. Yes, there is some possibility of free ridership. But the commission. Believe that there are incentives. Work when projects are proposed that do provide benefits to everybody in the zone that their incentives. To agree to those, otherwise those projects might not happen. So, I'd say another. Point is that the. The commission looked at the evidence presented by the petitioners. That free ridership would be as such significance as to cause cost causation. Problems and that's part of the old dominion test. It's not just there's cost not allocated to customers that benefit. But also, I think, in the words of the sport and old dominion. That there would be the allocations of the customers do pay would be. Grossly disproportionate to the benefits. That they receive and then hold the case. The, the single zone was allocated 100% of the cost of 2 projects. And they received less than 50% of the benefits. Here, if we look at Evergy zone 9. They have 98% of the load, which means if they build a project. Their, their customers are going to get at least 98% of the benefits. That's not a grossly disproportionate allocation. Their other zone is 88% and that's what Oklahoma gas and electric is 88%. So, even if in a worst case scenario. These companies build a project that where there's no zonal allocation. There's still not a grossly disproportionate allocation of costs as compared to benefit. No, you only have a minute, so I'll ask fast and maybe you can answer it fast. And ultimately, I think it was high voltage power lines where the project that issue. And the court said, well, that's going to benefit everybody. What's an example of a project that might not. Benefit everybody as much as the projects and old dominion. Well, we could use the example that Oklahoma gas and electric gave of how they loop. A low voltage transmission lines when they get to a certain. Amount of use looping is basically creating another line that follows. A single line so that if the 1 line goes down. Then there's another line that can serve the load those low voltage. Facilities are used primarily in rural areas to serve. A relatively small number of customers. So, leaving that line will benefit those customers. But it's likely not going to benefit everybody in the zone. If there are no more questions, your honor, I would just like to say that it's been an Even when he rules against. Thank you. Well, I would add that when I 1st got here. The order 500 series was before us as a complex case. Completely reorganized the pipeline industry. And the 3 newest judges were drawn to that. I've never believed that was an honest girl. That began my doubt as to whether I should have taken the job. Thank you. Thank you. And by the way, I was also on 888. He came up with these reasons to begin with. Well, we're going to miss you for the next big order. For now. Good morning. May it please the court for the intervenors in support of. Council for a Southwest powerful. I'd like to start 1st with judge Walker's questions about other companies that supported proposal. I think my colleague mentioned the Southwestern public service company and Excel affiliate. They are in a zone where they are the majority transmission or they own most of the transmission. They also support most of the load. They are on our brief and support of this proposal. The largest customer and there is on gold spread electric cooperative. Who single handedly could, if they wanted to vote against criteria, and that would be more than the half of the remaining load. That is needed to support a criteria going forward. They also are on a brief and support this proposal. Another zone that has been addressed is the zone. The zone is the majority transmission owner and the majority load serving entity. They have 6 minority transmission owners in their zone. Each of those transmission owners under the previous tariff. Could have adopted whatever criteria they wanted. Gave them to made develop projects based solely on those criteria. And then and all the other customers in the zone would have to pick up the costs. This is why this proposal was put out. So, I know I asked the question. So, if anyone's at fault, it's me. But is any of that in the record? And if it's not, then is there any way we can take judicial notice of something? That's publicly available. I'm not aware of anything that's publicly available. I could find out and perhaps file a 20 letter in the future. Both of those companies, actually, all the companies and golden spread are all on the record supporting this fine. I would also note that in the zone 14, there are 2 transmission owners. They're both petitioners here. 1 is evergy. The other is gridliance. Under the previous tariff, nothing would have prohibited gridliance from developing their own criteria and making evergy's companies customers pick up the costs. So, this is why this proposal was developed. It was important for SPP and its stakeholders to have a process where customers who are required to pay the cost of facilities would actually have a say in how those facilities were designed and developed. Under the previous construct, as I've noted, transmission owners could basically do what they want and SPP's tariff obligated them, obligated SPP to apply those criteria. Now, there's a check, check and balance on the whole system. The transmission owner can propose their criteria as part of the zonal process. Customers can propose their own criteria. They can discuss and then have a vote. And if nobody's criteria move forward, the SPP criteria will apply. And what's important to note there is that the SPP criteria are designed to address the federally enforceable reliability standards. They set the floor for what reliability folks may want in the zone. What we're talking about here is individual entities desire for reliability that exceeds what federal law requires. So, this is sort of gravy on top of meeting, you know, the basic reliability standards that FERC has imposed through the federal power. Looks like I'm out of time. I don't know if you have any other questions or. No, thank you very much. If I could just have one other second to address one other point. There's been talk about the 206, filing a future 206 complaint. I don't think that's the only avenue that petitioners might have if they do identify a project that has reliability benefits beyond just their own customers. They could pursue a one-off tariff change. They could pursue a mutual agreement with customers in the zone. They're not just limited to a 206 complaint to challenge this entire regime. There are other options. Thank you. Thank you very much. And Judge Santel, thank you for your service. All right, I believe Mr. Shepard. All right. Thank you, Your Honor. I think that the first thing that I should address is that the concept that there is some sort of co-equal gamble happening here. The center of gravity in all the questions that I'm hearing is some sort of notion that the transmission customers and the transmission owners are bargaining. They don't bargain. If you don't have more than one transmission owner, there's not going to be any force trading as between them. They're the ones who build projects. We've asked questions along the lines of what if the transmission customer wants a particular kind of project. Sure, ask. If SPP is planning, people say that it can be built without causing a problem with the system. No problem. I'm sure that the transmission owner will be very happy to build that project for them and collect a rate of return on it into the future. It's just, I think they're really mixing apples and oranges if the thought here is that there's force trading going on against these entities as they relate to one another from the TO and TC perspective. So I did not, I'm sad to say, come here entirely prepared to discuss the details of the voting alignments in all the zones where my clients don't operate. And I don't have a reason other than speculation to explain why AAP and Excel landed where they did, except that I would bet that they're pretty sure that they've got the votes to secure whatever it is they need to do. Perhaps because they're in a situation where they have multiple TOs with whom they could make a bargain and get over that extra 50%. That's not the case for us. It's not the case for us in Zone 9. It's not the case for us in Zone 6. It's not the case for us in Zone 14. So they can think it's wonderful, all that they want, but that has nothing to do with whether or not there's some viability to our claim because of the way it impacts us. It's a badly written rule, and it works terribly in our situation. That's why we're investing the time and the energy here to fight it. Well, you predict it will work terribly. FERC predicts it will work well. And we owe some deference to FERC's expert predictive judgment. I don't think that's right, Your Honor. I don't think you owe any deference to their predictive judgment if what they're saying is nuts. If you're in a situation where you own 1%, you're 1% of the load, and you now have an opportunity to not put it on a sliding scale and say, oh, I'll take this much or this much, because I think that's the way that the Court's thinking about this, like it's on a sliding scale. This is not that way. These are the transmission customers at step one. Just flip off an off switch. There's no discussion about why it's roughly commensurate. Why is it nuts to think that the 1% company will vote for the 99% project in exchange for the 99% companies voting for the 1% project, especially when the 99% company is only going to get 1% of help for their project. The 1% is going to get 99% help for their project. That, I think that Your Honor is still thinking of this as a situation where they're trading for, I suppose a transmission customer could say, we'd like you to build this thing. It's just like in Congress. It's like in Congress. But this is what they're concerned about. You vote for my pork barrel project in exchange, that I don't really care about. In exchange, I'll vote for your pork barrel project. That is not, that's, I mean, you could vote for the zone of reliability requirements, one supposes in a stretch, but the more immediate and obvious incentive is just to say no. It's not like the, that's in your short-term, that's in a company's short-term interest, but that may be very much adverse to their long-term interest. And I mean, these are sophisticated players. I'm not sure I agree with that characterization, but no, I don't think that's the case. So we've talked about that. We talked about the alignment of parties and other utilities. I'm not going to care to make excuses for Excel and AEP. I think they made a terrible choice here, but they must feel like they have a lock on whatever plans they have. Maybe it's our clients who are the ones who don't feel like they were able to cut a deal with people with whom they serially fight. But that's, I don't think that really is the correct way to analyze this case of whether or not someone else is willing to live with something that we weren't willing to live with. Wouldn't want to be in an HOA that operated that way. And I don't want to be in an RTO that operates that way either. And on the subject of collateral attack, yes, it is possible. I suppose there's some other way beyond a 206 complaint to come back, but whether it's a 206 complaint or some variation on a 205 is if we have 205 filing rights to change the SBP tariff, which we do not. There is no way to frame a complaint in 206 later, which is not going to regurgitate the exact same theory where we brought you here. Here, we see the poison pill is right in front of us. We're saying there's a poison pill. We don't want to take it. We don't want to eat the cyanide and then like come back and challenge it and challenge it later when we know that it's not going to work. There are things that we would like to do. We need the agreement of the other utilities to do this. And finally, I think the court got this very thoroughly in the briefs, but mandatory reliability standards by NERC, absolute rock bottom lowest common denominator. That we've been presented with the evidence in the record, at least 26 projects that never, ever could be approved under this new system are in service right now. No one's questioning whether or not they have any value for anyone. But because they were built according to local and only local planning authority, which used to be the way things were prior to this order issuing, they can never be done now unless the company agreed to take 100% of the cost. That clarifies the record. Thank you for your time. Judge Sintel, I'm glad you mentioned Order 888. I don't know if you remember that I was clerking on that same case. Thank you, counsel. We'll take the case under advice.
judges: Wilkins, Walker, Sentelle